We'll turn to the third and last case to be argued, Krechmer v. Tantros. Good afternoon. May it please the Court, my name is Jay Wolman. I represent appellant Michael Krechmer. Mr. Krechmer wishes to vindicate his right to moral attribution as author of Tied Up in Knots. Wait, he signed a contract originally that said he had no right of copyright. Isn't that correct? That was the original agreement which was then terminated. Did that original agreement also provide that it couldn't be amended except in a writing? That is correct, however, New York law... Okay, right, so it couldn't be amended in the writing and you're claiming that it was amended? No, we're claiming it was terminated and superseded by a separate agreement orally. Did both parties agree to that? That is what Mr. Krechmer would testify to. That's the only evidence that the agreement was terminated and a new agreement substituted, right? I would suggest that the record is replete with other indicia that the parties engaged upon a new course of action on July 21st. You're saying it could be terminated orally? Yes, Your Honor. New York law, this was not an issue that Judge Forrest decided. It was, however, raised in some of the briefings below. I'm raising the issue because I think that it's close to sanctionable behavior on your part to claim that an agreement that says it can only be amended with a writing was amended orally. Your Honor, the New York law separates and distinguishes modifications that are oral, where there's no oral modification provision, from terminations that are oral. It did not have a no oral termination clause. Is there a termination in the record that I missed? A termination of the first contract? Mr. Krechmer submitted a verified complaint which constitutes his affidavit in which he stated that it was It terminated unilaterally? No, the parties did. In fact, it was Ms. Tenteros' suggestion because she wished to engage him as a ghostwriter at that point. Is this a writing, the termination, apart from the verified complaint? Anything that I can look at that would convince me that both parties agreed to a termination? Well, certainly there was some text messages where Ms. Tenteros stated that she felt that she had now not only gained a writer but a friend at that point where she sent him a check, a five-figure check, that was not consistent with the collaboration agreement, the written agreement. This memorializes essentially her understanding that they are now on a new course of conduct. But your theory is that the termination was oral. It has to be. Yes. How does that get around Section 9 which says all notices shall be in writing? It's not a notice. You don't need a notice of termination. There are notices required. I'm sorry. Of course you need a notice of termination. I don't understand why Your Honor is suggesting that when New York law does not require it. Israel, I apologize, had the site. Israel v. Chabra, 12, New York 3rd, 158, 2009. Looking at GDL, GOL, sorry, 15-301, it distinguishes oral termination and modification agreements, sorry, agreements that have no oral modification from agreements with no oral termination. This agreement had a no oral modification clause. It did not have a no oral termination clause. And explain the significance of what you're saying to me. You don't think a no oral termination clause would apply? Do you concede that absent this alleged ghostwriting agreement, he has no claim to the copyright of this book? Under the collaboration agreement, it states that the rights would belong to Ms. Tinteros and Estero. It depends then on how we where they're memorializing, yes, where he's really not an author but an editor at that point. Does he have any claim to copyright? That's what I'm asking you. I would suggest he does, given the change of circumstances, that I don't believe that that was an assignment of rights, but rather just a memorialization as to joint authorship. But 5.1 says Kretschmer relinquishes all rights to the work. And it also says this section survives any termination of this agreement. So how can he have any claim to copyright in the work? Well, for whatever he did, and I would submit that the work done prior to July 21, 2015, Ms. Tinteros and Estero may have a claim to, to the extent it actually then survived into the work itself. And certainly the Court could go through and figure out how much of that pre-July 21 work ultimately was everything after July 21. And when we go through the record, when we go through my client telling Ms. Tinteros he's writing 10,000, he's writing 15,000, he's writing however many words he's going and giving her 50%, 60%, 70% done updates with writing the book itself, that new material would not be covered by a terminated agreement where he was not performing the work under that prior agreement but performing new work. But, but how was the agreement terminated? That's where we started this discussion. In a conversation between Mr. Kretschmer. An oral conversation? Yes, Your Honor. You heard the sections of the contract that Judge Atkin just read to you that said it couldn't be terminated except in writing? It does not say that. I'm sorry, I think it does. Judge Atkin was reading the section regarding the rights and how that survives the contract. If we look at section 12.1, it's talking about modifications and it says no oral modification. It does not say no oral termination. All right. And New York law does treat them separately. We did not brief that issue because it was not part of one of the things that Judge Forrest decided, but below it we did raise it and the case I cited to Your Honor before supports that New York does. It may be a little funny under law. I recognize that. It's unusual, but New York does in fact distinguish modifications and terminations. And this, but this did say all notices shall be in writing. You're saying termination did not require a notice. And the next question then would be why would the termination why would Mr. Kretschmer be the one who has to give notice? Certainly if both parties are jointly deciding to terminate, Mr. Kretschmer is not terminating. He's not has to give a notice himself to the other side. Ms. Tenteros isn't having to give a written notice to him. They came to an oral agreement. Can I ask you another sort of high level question? Your overarching theory here is that relinquishment of rights and the collaboration agreement was no longer effective one way or another. And an assignment of rights had to be in writing. Yes, Your Honor. But the ghost writing agreement was an oral agreement. Yes, Your Honor. And with all those are true, then doesn't it follow that even if Ms. Tenteros had paid the full $150,000, you would still have a DMCA 1202 claim because she was misstating the owner of the copyright because he owned it? At that point, yes, Your Honor. However, the parties were prepared in the usual and customary course to execute supplementary documentation, which is customary in the industry, certainly, that if you have an agreement before you write something, after you've actually already written it, you know what? The law is not actually clear as to whether or not pre-creation assignments of this is the work. I'm assigning it. And he wouldn't have had any concerns. And he would have waived his right to attribution, certainly, had he been paid. He was not. So he was under no obligation to waive that right. And he is fully entitled to assert it. He acted appropriately under an abundance of caution, filing the claim under seal, assuming some aspects of it would still be confidential, although arguing First Amendment rights. The Court ultimately agreed with that. But he is entitled to claim authorship. If the parties then want to work something out, he can—well, it's a little late, essentially, to say he's not the author. He waived all those rights in the original contract. Which was then terminated. So you say. And that is for a jury, you know, Your Honor. A jury can say, I believe, Ms. Tinteros, I don't believe, Mr. Kretschmer, that that happened. But that goes down to a credibility finding that we're here on either a 12b-1 or a 12b-6 stage that the district court didn't reach. Thank you very much. Thank you, Your Honor. You reserve some time. Good afternoon, Your Honor, and may it please the Court. I am Levi Leshes. I am representing the Andrea Tinteros and Astero, LLC. I will reorder my argument. I was here to address the 12b-1 issue. I sense in the air a tendency to look towards the 12b-6 issue, so I'll preliminary address that, and then I'll move on to 12b-1. I believe that the district court correctly dismissed the case under 12b-6 because there was no credible claim pled in the complaint, and there are a number of reasons of that. First, as a predicate matter, the complaint itself alleged the existence of an agreement between sophisticated parties that was in writing. As this Court is aware, and it's arguable whether it's judicially noticeable, but contracts between sophisticated parties tend to contain integration clauses, such as the one which the record clearly shows existed here. And I will also point out that this was converted to a Rule 56 motion, so the Court properly had before it the integration clause. And looking at that integration clause, the Court correctly decided that the entire theory of an oral agreement was absolutely precluded by the parties' agreement. If it was possible to get around an integration clause by simply saying, well, the oral modification started off by repudiating the agreement and then entering a new one, that would effectively eviscerate the entire utility of any integration clause in modern commas. Furthermore, this also creates a 12b-1 issue. The 12b-1 issue that results from the 12b-6 issue is that the complaint admits on its face that there is a tripwire of state law issues that need to be adjudicated before you can even reach the threshold issue of whether there is a copyright claim involved. And as we believe was correctly noted, the existence of the integration clause automatically precluded any claim of the, of the, of a copyright claim. Because the parole evidence rule is a rule of evidence, it's not an affirmative defense. Therefore, the existence of the parole evidence rule essentially would require the judge to start off with a state law issue and start with any analysis in this case would, per force, need to start with a state law analysis. And there is no authority to say that subject matter jurisdiction can be asserted on a federal question which starts off with a point of departure is a state law issue. And I think that was the precise holding of the TB harms case, which says just because you have a federal, a creature of federal law that is the subject of a state law dispute, that does not create federal jurisdiction. Moving on to the DMCA claim, I think to address something which Judge Oetken said, Edkin mentioned, there is no credible DMCA claim because of the intent issue. There's a heightened requirement of intent, which was acknowledged in appellant's brief, and that is simply not present in this case, because even assuming we're going to take or even if we're going to put aside the issue that this actually became a 12 rule, a rule 56 motion, putting that aside and even looking at this as a rule 12 issue, it is still alleged on the face of the complaint that there is some kind of agreement which was a ghostwriting agreement, a ghostwriting agreement meaning that there's going to be complete secession of ownership at the time of payment. Therefore, Ms. Tanteros could correctly assume that she was the owner of the material and any claims arising from the alleged breach of contract went to the issue of remedy, not to an issue of ownership. And so even whether that was a correct, whether that would be a correct conclusion, it's impossible to say that on this record there was an intent to communicate false content, because there was even looking at all facts from a rule 12 standpoint in favor of the appellant, there would still be nothing showing that there was a false intent. Moving forward, there's another issue, which is in the Thompson case, which was cited in the appellant's brief, and it's also reaffirmed in Childress v. Taylor, a joint work is entirely owned by the joint owners. And I believe based on Supreme Court case law, it's analogized to a tenancy in common under ordinary property principles. Therefore, under those ordinarily, under established law, a joint author is a 100% owner in any joint authorship, except that there is a duty of accounting to the other owners. Under these facts, the appellants have not shown any authority that allows a, the appellants have not shown any authority that allows a DMCA case based upon a joint ownership claim, and given the court's holding in Childress v. Taylor and Thompson, it would seem absolutely precluded to be able to raise a DMCA claim based on a jointly owned work. So I think this court would be correct in affirming the district court's order on a 12B6 grounds based on the fact that there was no credible DMCA claim because there is no intent, and even if there is an intent under existing case law, both owners are 100% owners. And second, and there's no authority to say that that could constitute a DMCA violation under these circumstances. And secondly, the entire grand theory here is just simply precluded by an issue of state law, which is the parole evidence rule. And you don't believe that this agreement could have been orally terminated. It couldn't be orally modified. We know that. But could it be orally terminated? I think that is precluded absolutely on the record because it's a well-established principle of contract law that contracts are interpreted in light of the whole. Looking at the contract as a whole, there is a provision which provided a, which provided a allowance for Ms. Tanteros to terminate the agreement without any further consequence or penalty, right, if at the, I believe it was the completion of a single chapter. And therefore, and I'll also add that the record shows that the email correspondences which appear in the last volume of Appellee's Supplemental Appendix show that that was an explicitly negotiated and thought out provision in order to ensure that if Mr. Kirchner's work was not satisfactory, the agreement could not be terminated. So the agreement viewed in light of a whole shows that there were specific provisions provided to allow an exit ramp, as the parties discussed it, without, in a certain circumstances, which those certain circumstances were in the event that the first chapter was unsatisfactory. There is nothing analogous in terms of terminating the agreement after that step. And therefore, that clearly shows there was no intent to allow a termination with, which would operate in a different procedure than the ordinary integration. No. What do you make of the verified complaint of Mr. Kirchner that says that they have a new ghostwriting agreement? What do you make of that? Is that enough to bring the issue before us? I don't believe so, because if that was enough to make, bring the issue before the court, then as I mentioned before, there would be absolutely no utility to a no written modification clause accompanied by an integration agreement in modern commerce. It's a principle operating procedure of how contracts operate. And even assuming the correctness of Mr., of the appellant, the appellant's affidavit, that still cannot change the outcome. And therefore, the court will be corrected to affirm the outcome under 12b-6. And that also goes to 12b-1, because the critical fact on the 12b-1 issue is that there is no copyright alleged in this action. This is not the ordinary case where somebody's coming in and saying, I have a copyright which is not registered, but, and I have a meritless and frivolous copyright infringement claim. In that case, you say, well, there is a copyright, and therefore, I'm going to assert personal jurisdiction, then dismiss your claim under 12b-6. This is very, very different. Over here, there is no copyright, whether registered or unregistered. The question is, if Mr., Mr. Malice comes into this court and says, if I succeed on the declaratory judgment cause of action, then, then, in that event, I might have some kind of ownership insurance, which can, in turn, perhaps support a copyright claim. But that is not established, and therefore, you cannot bootstrap, you cannot bootstrap subject matter jurisdiction by taking an unestablished nonexistent fact and assuming its outcome in order to create that as a predicate fact of a federal claim, which the existence of a copyright is the predicate fact of a federal claim, and that is not even established. I believe I'm out of time, Your Honor. THE COURT. Thank you very much. Mr. Wallman. MR. WALLMAN. Thank you, Your Honor. Copyright adheres to the moment of creation. Mr. Kretschmer had copyright the moment he wrote Tied Up in Knots. JUSTICE SOTOMAYOR. He, he waived every right, every copyright right. MR. WALLMAN. He did that in the original agreement, but that was terminated. So, if we assume JUSTICE SOTOMAYOR. Oh, you say. MR. WALLMAN. Yes, and that is for a jury to decide. So, on the question of subject matter jurisdiction here, we have a cognizable claim. Sections 1202 and 1203 do not have a copyright registration requirement, unlike a claim for infringement. In fact, for example, Sections 501 and 504 specifically refer to registration of copyright under 411. Section 1202 and 1203 make no such mention, because other people, in fact, have standing. Section 1203 speaks of any person having the right to bring a claim. It doesn't require it. Cable companies bring 1201 claims under Section 1203 without owning the copyright. Pelley mentioned that this is not credible. Questions of credibility are for the jury. These claims that they're sophisticated parties, I would submit that they're not. This was her first book. She came to an agreement in January of 2014 to write it with the publisher. Six months later, and that was to be done by October 2014, or sorry, June or July of 2014, six months later, when she failed to deliver, they got an extension. And then six months after that, that's when she approached my client to help her write the book. And when that helping failed under their collaboration agreement in May 2015, then on July 21, 2015, a new paradigm was done. But you know what? The new paradigm is the ghostwriting agreement. But isn't it the definition of ghostwriting that the client's name is going to be on the book and not the ghostwriter? And if that's the case, how could it plausibly be alleged that she intentionally was interfering with someone else's copyright when she called the book hers? Because although that may have been what the parties were contemplating, certainly, when he would ghostwrite the book, at publication, when that came down to it in March 2016 and then April 2016, she knew she hadn't paid him. She knew she hadn't acquired the rights. She knew he was the author and hadn't waived his moral rights at that point. In fact, she was then pushing for a brand new nondisclosure agreement. If that brand new nondisclosure agreement were required, that evidences her belief that the earlier confidentiality clause was ineffective. Why? Because it had been terminated by the parties. And certainly, a jury can come to a different conclusion. It could weigh the evidence differently. But here, the Court dismissed, presumably under 12b1, which it should not have done since this Court has previously held in Saigon that even registration itself is not a jurisdictional requirement. Under 12b6, it would have been just wrong as a matter of law since Section 1203 and 1202 do not require it. So we're here on that. And then we can look at, yes, there were errors on the declaratory judgment count. Yes, there were errors as to failure to consider supplemental jurisdiction or discovery for diversity. And we can get into that as they did with respect to determining the declaratory judgment. But I would suggest that T.B. Harms still, under that, we're saying, was there an assignment? That's not a question of contract law. That's under federal law, was there an assignment? Thanks very much, Mr. Wallman. Thank you, Your Honor. Gave you some extra time as well as opposing counsel. We're glad to see you. We'll reserve decision. We're adjourned.